UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CODIE HORN,

      Plaintiff,    Civil Action No. 19-cv-10336
              Honorable Nancy G. Edmunds
              Magistrate Judge David R. Grand
v.

ROBERT BOSCH AUTOMOTIVE
STEERING LLC,

      Defendant.
_____/

## REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART WITHOUT PREJUDICE ROBERT BOSCH AUTOMOTIVE STEERING, LLC'S MOTION FOR SUMMARY JUDGMENT [11]

This is an employment discrimination action brought by plaintiff Codie Horn ("Horn") against his former employer Robert Bosch Automotive Steering LLC ("Bosch"). The case arises out of Horn's involuntary termination from Bosch after working for the company for about two years. (ECF No. 1.) In his complaint, Horn asserts the following claims related to his termination: 1) disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* (Count I); 2) breach of implied employment contract (Count II); 3) discharge against public policy (Count III); 4) violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.* (Count IV); 5) violation of the Elliot-Larsen Civil Rights Act ("ELCRA"), M.C.L.§ 37.2101 *et seq.* (Count V); 6) violation of the Persons with Disabilities Civil Rights Act ("PWDCRA"), M.C.L. § 37.1101 *et. seq.* (Count VI); and 7) retaliation under the PWDCRA (Count VII).

On October 25, 2019, Bosch filed a motion for summary judgment. (ECF No. 11.) Horn filed a response, and Bosch filed a reply. (ECF Nos. 15, 16.) This case was referred to the

undersigned for all pretrial matters under 28 U.S.C. § 636(b).  (ECF No. 4.)

For the reasons set forth below, this Court **RECOMMENDS** that Bosch's motion for summary judgment (**ECF No. 11**) be **GRANTED IN PART AND DENIED IN PART WITHOUT PREJUDICE**.

I.    **REPORT**

A. **Facts**

Horn began working at Bosch in July of 2016 as a Commercial Manager at its Plymouth, Michigan facilities.  (ECF No. 1, PageID.11.)  On June 16, 2016, Horn signed an offer letter with Bosch that explicitly stated: "Nothing contained in this letter is intended to create an employment contract or alter the traditional *employment at will* relationship between you and the company." (ECF No. 11-4, PageID.253 (emphasis added)).  On his start date, July 11, 2016, Horn also signed an Associate Handbook Acknowledgment Form that acknowledged his receipt of the employee handbook, and stated:

> [I] acknowledge that this handbook is neither a contract of employment nor a legal document and nothing in the Handbook creates an expressed or implied contract of employment.  *The employment relationship is at will* and may be terminated by the employer or Associate at any time with or without cause.

(ECF No. 11-3, PageID.250 (emphasis added)).

Horn first reported to Supervisor Mike Franchy, but in early 2018, he began reporting to Kikuko Clark ("Clark").  (ECF No. 11-5, PageID.255; ECF No. 11-1, PageID.189.)

On April 17, 2018, after having returned from a work trip to Japan, Horn began experiencing abdominal pain at his Michigan office.  (ECF No. 12, PageID.305.)  A co-worker drove him to the hospital.  (*Id*. at PageID.306.)  Ultimately, doctors determined the pain stemmed from liver stones.  (*Id*.)  Horn spent two days recovering, and returned to work.  (*Id*. at

PageID.310.)  Horn testified that immediately thereafter, Clark raised the notion of adjusting Horn's goals and removing him from certain accounts.  (ECF No. 12, PageID.314.)

On April 30, 2018, Horn submitted to Clark a request for travel approval to Florence, Kentucky from May 7-9, 2018.  (ECF No. 11-7, PageID.261-63.)  Clark approved the request.  (*Id*.)

On May 1, 2018, another Bosch employee, Kevin O'Keefe, sent an e-mail to Clark asking about a meeting that his assistant had scheduled between O'Keefe and Horn.  (ECF No. 11-9, PageID.267.)  He asked Clark: "What is the goal of the meeting?"  (*Id*.)  In response to this question, Clark e-mailed Horn stating: "Looks like you scheduled this meeting, privately, even after I talked with you that I will manage communication with Kevin moving forward.  Please advise your objective and discussion points with Kevin."  (*Id*.)

Horn did not appreciate Clark's e-mail, and forwarded a copy to Human Resources Manager Carrie King ("King") stating:

> I don't think it is very professional for [Clark] to assume my private meeting needed to include her.  I also feel threaten [sic] by the tone of her email.  I don't feel as if I can effectively accomplish my task with her sending such demeaning emails, where I am being spoken down to.
>
> Could you please talk with her in order to stop this kind of behavior?

(*Id*.)

On May 4, 2018, Horn e-mailed co-workers, Takeshita Shinichiro and Lewis Thomas, regarding "Toyotasupplier.com."  (ECF No. 11-10, PageID.271.)  He specifically asked: "Have you had any progress with adding me under [supplier number] 2180, to TS.com?"  (*Id*.)  Shinichiro responded by stating that Supervisor Clark sent out an invitation to discuss the matter, but cancelled it because she was out of the office.  (*Id*. at PageID.270.)  Shinichiro then asked Horn why he needed a 2180 account.  (*Id*.)  Shinichiro copied Clark on the e-mail.  (*Id*.)

3

Horn forwarded Shinichiro's e-mail to King again complaining about Clark, stating:

> I am having an issue with [Clark] not supporting me with getting access to TS.com under supplier number 2180. This request has been out there for over a month and she has cancelled meetings for no reasons and not rescheduled them. Our customer orders are being sent to supplier number 2180 and we were already late on one shipment because of this issue.
>
> Please urgently support me so the customer is not further impacted.

(*Id.*)

Prior to leaving for his trip to Florence, Kentucky, King invited both Horn and Clark to a meeting. (ECF No. 11-8, PageID.265; ECF No. 11-11, PageID.273.) The meeting occurred on May 7, 2018, and was regarding the Toyota/Nissan Alignment. (*Id.*) According to Clark, the meeting did not go well. (ECF No. 11-11, PageID.273.) In an e-mail to King that same day, Clark expressed a desire to commence Horn's involuntary termination from Bosch:

> [B]ased [on the] subject meeting today, I found [Horn] to be:
>
> - Unreasonable
> - Irrational/Unable to comprehend any rational concepts
> - Unable to retain any discussion details
> - Disgruntle[d]
>
> In summary, *his behavior is unacceptable and unfit for the position.* What are the option[s] for involuntary termination?
>
> I would like to stop by to discuss next steps. Thank you for your continued support.

(ECF No. 11-11, PageID.273 (emphasis added)).

On the same day of this meeting, Horn submitted a travel request for another trip to Japan. (ECF No. 11-6, PageID.259.) Rather than submitting the request to Clark, he submitted it to Supervisor Hans Koehlen ("Koehlen"), an Engineer in the Nissan Alignment group. (*Id.*; ECF 12, PageID.292-93; ECF 11-1, PageID.189.) Koehlen approved the request for Horn to travel for nine days, from May 23, 2018 through the end of that month. (*Id.*)

4

Horn testified that on May 16, 2018, just days prior to his trip to Japan, he informed Clark and King that he would need "to take some time off" from work due to his "pressing medical issues." (ECF No. 12, PageID.310.)  Importantly, however, Horn admits he did not ask for any specific time off, and that he never applied for leave.  (ECF No. 12, PageID.313-315.)  Horn testified that he was "unsure about what kind of time off [he] was going to need," and that rather than make a request for leave, he essentially "just wanted to prep them to let them know that, 'Hey, listen, I could be requesting some additional time off.'"  (*Id.*, PageID.313.)  Horn also admits Bosch never denied him any time off.  (*Id.*)  He also admits that, as of May 16th, he still planned to go to Japan a week later.  (*Id.*, PageID.311.)

Horn further testified that King and Clark met with him at some point (the record is not clear as to exactly when) on May 16, 2018, and "demanded [he] inform them of [his] private medical issues." (ECF No. 12, PageID.311.)  Neither Clark nor King provided affidavits in support of Bosch's summary judgment motion, and there is nothing else in the record about this alleged meeting, such as precisely what questions were asked, or why King and Clark were asking them. Horn testified that he refused to disclose anything about his medical condition at that time.[1]  (*Id.*, PageID.310-12.)

Horn went to Japan as planned on May 23, 2018, and apparently had no health-related concerns in taking this trip.  Indeed, Horn testified that while in Japan, he went skiing as part of a team-building exercise.  (*Id.*, PageID.304.)  Upon his return from Japan, on June 1, 2018, Clark

---

[1] However, earlier in his deposition, Horn testified that at some point he told Clark and King that he had liver stones and potentially cancer.  (*Id.*, PageID.309.)  Horn alleges that he called Vice President of Human Resources, Wes Johnson ("Johnson"), to express his discomfort with the May 16th meeting, and that he left Johnson a voicemail message to that effect.  Horn has filed a motion to compel in which he seeks a copy of the voicemail.  (ECF No. 13.)  That issue is addressed below, *see infra* at 15, and in a separate Order on the motion to compel.  (ECF No. 21.)

and King met with Horn.  (*Id.*, PageID.304-05.)  Horn claims they again asked him questions regarding his medical issues.  (*Id.*)  Specifically, Horn testified that Clark asked him, "Were you authorized to travel?" and "Was your health good enough?"  (*Id.*, PageID.305.)  Horn was suspended following this meeting.  (*Id.*)

The details and timeline of what happened next are somewhat unclear.  Bosch relies principally on a vague and perfunctory affidavit of Johnson, in which he simply averred:

> 5. On May 7, 2018, Mr. Horn submitted a travel authorization request to Hans Koehnle, requesting permission for international travel to Japan from May 23, 2018 through May 31, 2018.
>
> 6. Mr. Horn was required to obtain permission from and inform his direct supervisor, [Clark] regarding all international travel.
>
> 7. Mr. Horn failed to obtain permission from or to inform Ms. Clark of his international travel plans to Japan.
>
> 8. This failure to obtain permission from or to inform Ms. Clark of his international travel plans to Japan was insubordination and a violation of Bosch policy.
>
> 9. On June 1, 2018, I am aware that Mr. Horn raised his voice, insulted Ms. Clark and initially refused to return his Company phone and badge.
>
> 10. Mr. Horn was suspended on June 1, 2018.  On that day, Mr. Horn was required to return his Company phone and his badge.
>
> 11. Between June 1, 2018 and June 8, 2018, the Company engaged in discussions regarding making a severance offer to Mr. Horn.
>
> 12. The decision to terminate Mr. Horn's employment was made on June 8, 2018.
>
> 13. On June 15, 2018, Mr. Horn was offered severance.  Mr. Horn subsequently declined the Company's offer of severance.

(ECF No. 11-1, PageID.189-90.)

Bosch also provided an Administrative Change Form regarding Horn's termination that indicates it was "digitally signed" on June 8, 2018.  (ECF No. 11-12, PageID.276.)  While that

date is consistent with the date of an e-mail to which it was apparently attached, the Administrative Change Form indicates that Horn's "Last Day Worked" was June 15, 2018, and that his "Termination Date" was June 16, 2018. (*Id.*, PageID.275, 276.) The timing details are important because Horn filed an EEOC charge on June 12, 2018, and Bosch admits it did not advise Horn of his termination until June 15, 2018. (ECF No. 1, PageID.83; ECF No. 11, PageID.178.) On June 18, 2018, Horn filed another Charge of Discrimination with the EEOC claiming retaliation. (ECF No. 2, PageID.86.) The EEOC issued its Right to Sue letter on November 29, 2018, and Horn filed his federal complaint on February 4, 2019.

**B.    The Applicable Legal Standards**

Pursuant to Rule 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011). A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a

7

triable issue.'"  *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  In response to a

summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the

hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an

affirmative showing with proper evidence in order to defeat the motion."  *Alexander*, 576 F.3d at

558 (quoting *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989)).  Indeed, "'[t]he

failure to present any evidence to counter a well-supported motion for summary judgment alone

is grounds for granting the motion.'"  *Id.* (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir.

2009)).  "Conclusory statements unadorned with supporting facts are insufficient to establish a

factual dispute that will defeat summary judgment."  *Id.* at 560 (citing *Lewis v. Philip Morris, Inc.*,

355 F.3d 515, 533 (6th Cir. 2004)).

> **C.** **Analysis**
>
>> *1.* *Bosch is Entitled to Summary Judgment on Some But Not All of Horn's Disability Discrimination Claims under the ADA (Count I) and the PWDCRA (Count VI)*

Horn alleges that he is an individual with a disability within the meaning of the ADA and

the PWDCRA.  (ECF No. 1, PageID.15, PageID.22.)  He brings claims under both the ADA and

the PWDCRA.  In his complaint, Horn focused these two claims on different alleged adverse

actions by Bosch; he alleged that Bosch violated his rights under the ADA when he "requested

certain dates off in late June and early July, 2018 for medical treatment" and Bosch refused this

request, and that Bosch violated his rights under the PWDCRA when it terminated him.  (*Id.*,

PageID.16, 22.)   However, Horn also made assertions in his ADA claim implicating his

termination as an adverse action, including that he "indicated he wanted to continue his

employment with [Bosch]," and that as "a direct and proximate result of [Bosch's] discrimination

on the basis of disability, [he] suffered lost wages, benefits, and loss of employment opportunities." (*Id.*, PageID.16.)  Given Horn's *pro se* status, and the fact that the wrongful termination analysis would be the same under the ADA and the PWDCRA,[2] the Court will construe Horn's ADA claim as challenging both the alleged failure to accommodate his request for time off and his termination.

Bosch argues that Horn's claims fail because he failed to raise a material question of fact that he is disabled, and "otherwise qualified" for his position.  (ECF No. 11, PageID.171.)  Bosch also argues that even if Horn could clear those hurdles, it would still be entitled to summary judgment as to his wrongful termination claim because Horn failed to raise a material question of fact as to Bosch's contention that it had legitimate, non-discriminatory reasons for Horn's termination – insubordination.  (*Id.* at PageID.174.)

Very recently, the Sixth Circuit explained the standards applicable to disability claims under the ADA:

> The ADA prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  ADA discrimination claims are analyzed under two different rubrics, depending on whether the plaintiff relies on "direct" or "indirect" evidence of discrimination.  *See Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891-92 (6th Cir. 2016).  This court has explained the logic behind this distinction as follows:
>
>> When an "employer acknowledges that it relied upon the plaintiff's handicap in making its employment decision[,] the *McDonnell Douglas* burden shifting approach[3] is unnecessary because the issue of the

---

[2] Although the PWDCRA and ADA are identical in many respects, they are not identical in all respects.  *See Peden v. City of Detroit*, 680 N.W. 857, 870 (Mich. 2004).  The most noteworthy difference is that "[u]nlike the ADA, the PWDCRA does not provide specific guidance regarding what the *duties of a particular job* are."  *Id.* (emphasis in original).  Given the nature of Horn's particular claims, however, this distinction is immaterial.

[3] Under the *McDonnell Douglas* burden shifting approach, a plaintiff establishes a prima facie case

> employer's intent, the issue for which *McDonnell Douglas* was designed, has been admitted by the defendant[ ] and the plaintiff has direct evidence of discrimination on the basis of his or her disability."

*Id.* at 892 (alterations omitted) (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1182 (6th Cir. 1996)). Direct evidence of disability discrimination "'does not require the fact finder to draw any inferences'" to conclude "that the disability was at least a motivating factor." *Hostettler v. College of Wooster*, 895 F.3d 844, 853 (6th Cir. 2018) (quoting *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 916 (6th Cir. 2013)).

Because "not making reasonable accommodations" is listed in the ADA's definition of disability discrimination, *see* 42 U.S.C. § 12112(b)(5)(A), "claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007).

Under the direct framework, [the plaintiff] bears the burden of establishing (1) that she is disabled, and (2) that she is "otherwise qualified for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged essential job requirement eliminated; or (c) with a proposed reasonable accommodation." *Kleiber*, 485 F.3d at 869 (citation and internal quotation marks omitted). Once the plaintiff has established these elements, the employer "bear[s] the burden of proving that... a proposed accommodation will impose an undue hardship upon the employer." *Monette*, 90 F.3d at 1186.

*Morrissey v. Laurel Health Care Co.*, No. 18-1704, 2019 WL 7043167, at *3–4 (6th Cir. Dec. 23, 2019).

Under the ADA, a disability is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such

---

of disability discrimination under the ADA by proving: 1) he is disabled; 2) he is otherwise qualified for the position, with or without reasonable accommodation; 3) he suffered an adverse employment decision; 4) the employer had knowledge of the disability; 5) plaintiff was replaced by a person not in the protected class or the position remained open. *See Ferrari*, 826 F.3d at 891; *See Jackson v. Richards Med. Co*., 961 F.2d 575, 588 fn. 12 (6th Cir. 1992). If Plaintiff satisfies this burden, the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse employment action. *Id*. If the employer does so, the burden shifts back to the employee to prove the reason is pretextual. *Id*.

impairment; or (C) being regarded as having such impairment."  *See* 42 § U.S.C. 12112(a).

Likewise, under the PWDCRA, a disability is defined as:

> (*i*) A determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic:
>
> (A) For purposes of article 2, ***substantially limits 1 or more of the major life activities*** of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position or substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's qualifications for employment or promotion.
>
> * * *
>
> (*ii*) A history of a determinable physical or mental characteristic described in subparagraph (*i*).
>
> (*iii*) Being regarded as having a determinable physical or mental characteristic described in subparagraph (*i*).

*See* MCL § 37.1103(d)(emphasis added).

Major life activities under both statutes include caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, communicating, and working."  *See* 42 U.S.C. § 12102(2); *see also*, *Stevens v. Inland Waters, Inc*., 220 Mich. App. 212 (1996)(PWDCRA).

### a.    *Substantial Limitation of a Major Life Activity*

Bosch argues that Horn fails to raise a material question of fact that his liver stones amount to a disability that "substantially limited one or more of his major life activities" as required by the ADA and PWDCRA.  (ECF No. 11, PageID.172.)  The Court agrees.  Horn's complaint is devoid of any allegations that his liver stones affected his ability to care for himself, perform manual tasks, see, hear, eat, sleep, walk, stand, lift, bend, speak, communicate, or work, and Horn produced no evidence of any such substantial limitation caused by his liver stones.  Indeed, in his deposition,

Horn admitted that he continued to work, travel, and ski after his liver stone diagnosis. (ECF No. 12, PageID.315-316; 318-320.) Considering these undisputed facts, Horn failed to raise a material question of fact that he suffered from a condition that "substantially limits" a major life activity.

Thus, to the extent Horn's discrimination claims require him to show "that []he is disabled," *Morrissey*, 2019 WL 7043167, at *3–4, Bosch is entitled to summary judgment.

### b.    Request for Accommodation

Horn also alleges that Bosch violated the ADA when it failed to accommodate his disability. Specifically, Horn alleges in his complain that he "requested certain dates off in late June and early July 2018 for medical treatment," and Bosch refused this request. (ECF No. 1, PageID.16.) This claim fails because its factual predicate is belied by the undisputed record evidence, including Horn's own testimony.

The applicable EEOC regulations provide that it is "unlawful for a covered entity not to make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with a disability, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of its business." *See* 29 C.F.R. § 1630.9(a). However, an "employer is not required to speculate as to the extent of [an] employee's disability or the employee's need or desire for an accommodation." *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046–47 (6th Cir. 1998). "Nor is it the employer's obligation to propose an accommodation — the employee must affirmatively request one." *Lowes v. Baldwin*, No. 2:18-CV-537, 2019 WL 7290504, at *11 (S.D. Ohio Dec. 30, 2019) (citing *Cady v. Remington Arms Co.*, 665 F. App'x 413, 418 (6th Cir. 2016); 29 C.F.R. pt. 1630 App. § 1630.9 (2016) ("[I]t is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.")). Although there is "no bright-line test for when the form of an

employee's request is sufficiently clear to constitute a request for an accommodation," *Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 407 (6th Cir. 2014), and "an employee need not use the magic words 'accommodation' or even 'disability,' the request does need to make it clear from the context that it is being made in order to conform with existing medical restrictions." *Leeds v. Potter*, 249 Fed.Appx. 442, 449 (6th Cir. 2007). *See also* M.C.L. § 37.1210 (18) ("A person with a disability may allege a violation against a person regarding a failure to accommodate under this article only if the person with a disability notifies the person in writing of the need for accommodation within 182 days after the date the person with a disability knew or reasonably should have known that an accommodation was needed.").

Here, even construing the evidence in the light most favorable to Horn, he cannot satisfy his burden of showing he made a request for an accommodation. Contrary to the vague allegations in his complaint, which are not evidence at any rate, Horn admitted at his deposition that he did not ask for any specific time off and never applied for leave. (ECF No. 12, PageID.313-315.) In fact, Horn testified, that he was "unsure about what kind of time off [he] was going to need," and that he only advised Bosch that at some later point in time he "*could be* requesting some additional time off." (*Id.*, PageID.313.) Horn also testified that Bosch never denied him any time off. (*Id.*) Under these undisputed facts, Horn failed to raise a material question of fact as to whether he requested an accommodation, and Bosch was under no obligation to provide one. *See Gantt, supra*.

Accordingly, Bosch is entitled to summary judgment on Horn's failure to accommodate claim.

        c.     *"Regarded-as-Disabled"*

Bosch recognized in its summary judgment motion that even if Horn's impairment did not

substantially limit one or more major life activities," he could still establish a violation of the ADA and PWDCRA by showing that Bosch regarded him as having such an impairment. (ECF No. 11, PageID.172.) Whether to grant summary judgment to Bosch on this claim is a very close call. However, at least on the present evidentiary record, and in light of the Court's Order of today's date requiring Bosch to provide certain additional discovery related to this issue (ECF No. 21), the most prudent course is to deny this portion of Bosch's summary judgment motion without prejudice.

"The regarded-as-disabled prong of the ADA [and PWDCRA] protects employees who are perfectly able to perform a job, but are rejected ... because of the myths, fears and stereotypes associated with disabilities." *See Ferrari,* 826 F.3d at 892-93 (quoting *Daugherty v. Sajar Plastices, Inc.,* 554 F.3d 696, 703 (6th Cir. 2008)(quoting *Gruener v. Ohio Cas. Ins. Co*., 510 F.3d 661, 664 (6th Cir. 2008). "Individuals may be regarded as disabled when (1) [an employer] mistakenly believes that [an employee] has a physical impairment that substantially limits one or more major life activities, or (2) [an employer] mistakenly believes that an actual, nonlimiting impairment substantially limits one or more [of an employee's] major life activities." *Id*.

The record is undisputed that after Horn's two-day hospitalization in mid-April 2018, he returned to work, and that Clark shortly thereafter approved his trip to Kentucky. (ECF No. 11-7, PageID.261-63.) Certainly, nothing in that particular interaction suggests Clark regarded Horn as disabled as a result of his ailment. However, Horn provided evidence that raises questions about how Clark perceived the impact of Horn's illness on his ability to perform his work. First, Horn testified that he "worked perfectly with [Clark] in the past," but that after being rushed to the hospital from work on April 17, 2018, "then we start flying into e-mails about 'I want to take you off Nissan . . . Let's modify your goal performance, GPD'; right? And I'm wondering, 'Where is

14

this all coming from?"  (ECF No. 12, PageID.314.)  At the hearing, Bosch suggested evidence existed that would conclusively disprove Horn's testimony on this issue, but that evidence is not presently before the Court.  It is also possible that some of the documents the Court has ordered Bosch to produce to Horn – including e-mails – will bear on these issues one way or the other.  (ECF No. 21.)

Second, Horn testified that on May 16, 2018, Clark and King "demanded [he] inform them of [his] private medical issues," and that on June 1, 2018, when Horn returned from Japan, Clark asked him, "Was your health good enough [to travel]?"  (*Id.*, PageID.305, 311.)  Bosch did not meaningfully address this testimony in its summary judgment brief.  And, when the Court questioned Bosch about it at the hearing, Bosch responded that because Horn did not regard himself as disabled, neither could Clark have so regarded him.  But that argument is exactly contrary to the very premise of a "regarded-as-disabled" claim.  *See Ferrari,* 826 F.3d at 892-93 (noting that the focus is on the employer's mistaken belief about the employee's impairment).  Moreover, Horn claims he left a voicemail for Johnson about the May 16th incident, and, as explained in the Court's Order on Horn's motion to compel, Bosch did not meaningfully address that piece of evidence as it relates to this claim, though Bosch claimed it would be able to do so through a proper stipulation and additional argument.  (ECF No. 21.)

For all of these reasons, the Court should deny Bosch's summary judgment motion without prejudice as to Horn's "regarded as disabled" claim, and allow Bosch to file a renewed summary judgment motion as to that claim after it has produced the evidence ordered by the Court in its ruling on Horn's motion to compel.  (ECF No. 21.)

> d. *On the Present Record, Questions Exist Regarding Bosch's Alleged Legitimate, Non-Discriminatory Reason for Termination*

Bosch argues that even if Horn raised material questions of fact sufficient to support a

*prima facie* case of disability discrimination, it is still entitled to summary judgment because it terminated Horn for a legitimate, non-discriminatory reason – insubordination – and Horn cannot show that reason is pretext.  At least on the present evidentiary record, Bosch has not shown its entitlement to summary judgment on this issue.

The only document in the record that offers any sort of explanation as to why Horn was fired is Johnson's affidavit.  But that affidavit was conclusory and perfunctory, and it did not address arguably conflicting record evidence.  In pertinent part, Johnson averred:

> 5. On May 7, 2018, Mr. Horn submitted a travel authorization request to Hans Koehnle, requesting permission for international travel to Japan from May 23, 2018 through May 31, 2018.
>
> 6. Mr. Horn was required to obtain permission from and inform his direct supervisor, [Clark] regarding all international travel.
>
> 7. Mr. Horn failed to obtain permission from or to inform Ms. Clark of his international travel plans to Japan.
>
> 8. This failure to obtain permission from or to inform Ms. Clark of his international travel plans to Japan was insubordination and a violation of Bosch policy.
>
> 9. On June 1, 2018, I am aware that Mr. Horn raised his voice, insulted Ms. Clark and initially refused to return his Company phone and badge.
>
> 10. Mr. Horn was suspended on June 1, 2018.  On that day, Mr. Horn was required to return his Company phone and his badge.
>
> 11. Between June 1, 2018 and June 8, 2018, the Company engaged in discussions regarding making a severance offer to Mr. Horn.
>
> 12. The decision to terminate Mr. Horn's employment was made on June 8, 2018.
>
> 13. On June 15, 2018, Mr. Horn was offered severance.  Mr. Horn subsequently declined the Company's offer of severance.

(*Id.*, PageID.189-90.)

There are a number of reasons why Johnson's affidavit is insufficient to show the absence

of a material question of fact.  First, although Johnson avers that Horn's failure to obtain Clark's permission for the Japan trip was "insubordination and a violation of Bosch policy," during the hearing, Bosch's counsel admitted that there was, in fact, no formal "policy" that required Horn to obtain Clark's approval.

Second, the sole record Bosch relies on to support Johnson's averment raises questions.  In an e-mail dated May 31, 2018 – after Horn had been in Japan for over a week, Clark asked Koehnle, "Would you be so kind to confirm if you have signed Overseas (Japan) Authorization for Codie Horn in last 2 weeks?  Sorry to bother you.  I am checking to see *if he had proper authorization* since I did not process his request."  (ECF No. 11-6, PageID.258) (emphasis added.)  Koehnle answered in the affirmative.  (*Id.*)  At least on the present record – which does not include any other e-mails or documents about this particular issue, or affidavits from Clark, Koehnle, or any other Bosch employee providing further details about it – this evidence, construed in the light most favorable to Horn, leaves unanswered questions about who Horn was working with and reporting to with respect to scheduling and going on the Japan trip, and thus the "insubordination" determination.

Third, while Bosch repeatedly throughout its summary judgment brief implied that the May 7, 2018 incident between Horn and Clark, *see supra* at 4, directly contributed to Bosch's determination that Horn was insubordinate[4], Johnson's affidavit makes no mention of this incident. Nor did Bosch provide affidavits from Clark or King, or other e-mails or documents subsequent to Clark's May 7th e-mail that might speak to the connection between the May 7th incident and

---

[4] Bosch asserts, "Ms. Clark contemplated Mr. Horn's 'involuntary termination' by email as early as May 7, 2018 *and thereafter proceeded along those lines*, by suspending him on June 1, 2018 informing him on June 15, 2018 that he was terminated, effective as of June 8, 2018."  (ECF No. 11, PageID.162 (emphasis added); *see also id.*, PageID.180.)

Horn's ultimate termination.  The Court also notes that Horn provided a copy of his personnel file, which does not seem to reflect any negative notations related to the May 7th incident, and that Bosch has been ordered to produce additional documents to Horn that may bear on this issue. (ECF No. 16, PageID.350; 413-45; ECF No. 16-1, PageID.446-85; ECF No. 21.)  In short, while Clark raised the specter of Horn's involuntary termination on May 7, 2018, the present record is insufficient to allow the Court to rely on that in passing on Bosch's summary judgment motion.

Finally, as discussed below with respect to Horn's retaliation claim, *see infra* at 24-26, questions exist on the present record regarding the timing of Horn's termination, and those issues at least potentially bear on the Bosch's argument as to why it terminated Horn.  Again, the Court has ordered Bosch to produce documents related to the timing of Horn's termination.  (ECF No. 21.)

For all of these reasons, Bosch did not establish its entitlement to summary judgment on the issue of its legitimate non-discriminatory reason for Horn's termination.[5]

2.    *Bosch is Entitled to Summary Judgment on Horn's Breach of Implied Contract and Discharge Against Public Policy Claims (Counts II, III)*

In Count II, Horn asserts a breach of implied contract claim, alleging that while he was employed by Bosch, "he was led to believe that he would not be terminated except for good cause." (ECF No. 1, PageID.17.)  In Count III, Horn similarly asserts that because Bosch's "policies and procedures . . . instilled legitimate expectations of just-cause employment," his termination was in violation of an unspecified "public policy."  (*Id.*, PageID.19.)  Bosch is entitled to summary judgment as to both of these claims.

---

[5] This also precludes granting Bosch summary judgment on its argument that Horn was not "otherwise qualified" for his position; the only reason Bosch offers for Horn being unqualified is his alleged insubordination discussed above.  (ECF No. 11, PageID.173.)

*a.   Breach of Implied Contract*

Both the Sixth Circuit and the Michigan Supreme Court recognize the general rule that "in the absence of distinguishing features or provisions or a consideration in addition to the services to be rendered . . . contracts [for permanent employment] are indefinite hirings, terminable at the will of either party." *See Reid v. Sears, Roebuck and Co*., 790 F.2d 453, 455 (6th Cir. 1986)(quoting *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 596 (1980)). In *Reid*, three former Sears employees sued claiming that Sears failed to show good cause for their discharge. *Reid*, 790 F.2d at 455.  The court held, "[a]bsent a contractual provision for job security, either the employer or the employee may ordinarily terminate an employment contract at any time for any, or no, reason." *Id*. at 456 (citing *Valentine v. General American Credit, Inc*., 420 Mich. 256, 258-59 (1984)).  The court noted that before being hired, each employee signed an application for employment that stated:

> [M]y employment and compensation can be terminated with or without cause, and with or without notice, at any time, at the option of either the Company or myself. . . .

*Id*. at 456.

The court reasoned that statements of job security such as, "[t]he job is yours as long as you want it," or that the employee could be terminated only for specific reasons, did not alter the unambiguous at-will agreement. *Id*.  The court also reasoned that an employee handbook's listing of "causes" that may result in discharge did not alter the at-will employment relationship. *Id*. at 460.  Lastly, the court held that an employee's claim that she could not read well and/or did not read the at-will provision, did not change the at-will nature of her employment:

> The stability of written instruments demands that a person who executes one shall know of its contents or be chargeable with such knowledge.  If he cannot read, he should have a reliable person read it to him.  His failure to do so is negligence which estops him from voiding the instrument on the

> ground that he was ignorant of its contents, in the absence of circumstances
> fairly excusing his failure to inform himself.

*Id*. at 461 (quoting *Sponseller v. Kimball*, 246 Mich. 255, 260 (1929)).

The evidence here brings Horn's case squarely within the principles announced in *Reid*. On June 16, 2016, Horn signed an offer letter that explicitly stated his employment relationship with Bosch was "at will."  (ECF No. 11-4, PageID.253.)  In addition, at the outset of his employment with Bosch, Horn was provided an Associate Handbook, the first page of which unambiguously states, "The employment relationship is 'at will' and may be terminated by the Company [Bosch] or the associate [Horn] at any time."  (ECF No. 11-2, PageID.194.)  And, on his start date, July 11, 2016, Horn signed an Associate Handbook Acknowledgment Form that not only acknowledged his receipt of the Associate Handbook, but also stated:

> The employment relationship is at will and may be terminated by the
> employer or Associate at any time with or without cause.

(ECF No. 11-3, PageID.250.)

Clearly, Horn's vague allegations about being led to believe he could only be terminated "for cause" cannot undo the at-will nature of his employment with Bosch as memorialized in these documents.  *Reid*, 790 F.2d at 456.

Horn's other arguments also fail.  For instance, Horn claims that Bosch's Handbook created a "good cause" contract for employment via its Corrective Action Procedure and the Problem Solving Procedure.  (ECF No. 1, PageID.17-18.)  But, the Corrective Action Procedure explicitly states:  "the inclusion and use of this corrective action procedure *does not alter the at-will employment relationship* between Associates and the Company."  (ECF No. 11-2, PageID.206 (emphasis added)).  Moreover, nothing in the Problem Solving Procedure alters the at-will employment relationship.  (ECF No. 11-2, PageID.205.)  It simply outlines a chain of command

20

an employee can use if problems arise.  (*Id*.)

In his deposition, Horn testified that he did not read the documents containing the at-will employment provisions.  (ECF No. 12, PageID.287.)  However, as explained above, that is not a valid basis for not enforcing those provisions, particularly considering that Horn acknowledged receiving the salient documents.  *See Reid, supra*, at 461; *see also Mannix v. County of Monroe*, 348 F.3d 526, 533 (6th Cir. 2003).  Finally, Horn admitted during his deposition that he understood he was an "at-will" employee, and even referenced his understanding that "Michigan's an at-will employment state."  (ECF No. 12, PageID.289.)

For all of these reasons, summary judgment is appropriate on Horn's breach of implied contract claim.

### b.   *Discharge in Violation of Public Policy*

Summary judgment is also warranted on Horn's claim of discharge in violation of public policy.  Horn's claim is essentially a restatement of his breach of implied contract claim.  (ECF No. 1, PageID.19.)  Specifically, Horn states that Bosch's "policies and procedures, which were reasonably related to employee discharge, instill legitimate expectations of just-cause employment."  (*Id*.)  Bosch counters that this is not sufficient to state a claim for discharge in violation of public policy.  (ECF No. 11, PageID.183.)  Bosch is correct.

In *Suchodolski v. Michigan Consolidated Gas Company*, a plaintiff brought suit under six different theories of recovery, including age discrimination and termination in violation of public policy.  *Suchodolski v. Michigan Consolidated Case Co*., 412 Mich. 692, 693 (1982).  With regard to the termination in violation of public policy claim, the plaintiff alleged that he was terminated for "attempting to report" poor accounting practices.  *Id*. at 694.  The Court affirmed the lower court's granting of summary judgment to the employer because the case involved "a corporate

management dispute and no clear mandate of public policy." *Id*.  The Court reasoned that in order to state a claim for termination in violation of public policy, the employee must illustrate that the reason for discharge was "so contrary to public policy as to be actionable." *Id*. at 695.  This occurs most often when the public policy is "found in explicit legislative statements prohibiting discharge, discipline, or other adverse treatment of employees who act in accordance with a statutory right or duty." *Id*.  It also occurs when an employee is terminated for refusing to violate a law. *Id*.  Lastly, "the courts have found implied a prohibition on retaliatory discharges when the reason for a discharge was the employee's exercise of a right conferred by a well-established legislative enactment," such as filing workers' compensation claims.  *Id*. at 695-96.

Here, Horn only states that Bosch "interfered with the legitimate expectation of just-cause employment" in his count of discharge in violation of public policy.  (ECF No. 1, PageID.19.)  But again, Horn had no legitimate expectation of "just-cause employment," and he does not identify any public policy in any legislation or law that Bosch violated with regard to just-cause employment.  Nor does Horn cite any law that he refused to violate.  (*Id.*, Page ID.19-20.) Therefore, Bosch is entitled to summary judgment on this claim.

### 3.    *Bosch is Entitled to Summary Judgment on Horn's FMLA Claim (Count IV)*

In his complaint, Horn alleges that on May 16, 2018, he notified Bosch of the need for time off for medical testing, and that "[i]n failing to allow [him] to take time off for medical testing, [Bosch] violated [his] rights under the FMLA."  (ECF No. 1, PageID.20.)  Bosch counters that "irrespective of whether Mr. Horn refers to a claim of FMLA interference or FMLA retaliation," the claims fail because Horn never notified Bosch of his need for a leave for medical testing.  (ECF No. 11, PageID.183-84.)

"To invoke the FMLA's protection for this qualifying reason, the eligible employee, during

22

his employment, must request leave and give the employer notice that he is requesting such leave for a serious health condition that renders him unable to perform his position's duties." *Brohm v. JH Properties, Inc.*, 149 F.3d 517, 523 (6th Cir. 1998); *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 421 (6th Cir. 2004). "The test for substantively sufficient notice is whether the information that the employee conveyed to the employer was reasonably adequate to apprise the employer of the employee's request to take leave for a serious health condition that rendered him unable to perform his job." *Brunson v. Montgomery Cty.*, No. 3:16-CV-368, 2019 WL 1559548, at *10 (S.D. Ohio Apr. 10, 2019) (citing *Brenneman*, 366 F.3d at 421.

Horn's own testimony shows that he cannot meet these standards:

> Q.   Well, did anybody ever deny your time off?
>
> A.   No, because I had never put official request in for any time off because I was –
>
> Q.   Okay.
>
> A.   -- unsure about what kind of time off I was going to need.  I just wanted to prep them to let them know that, "Hey, listen, I could be requesting some additional time off."

(ECF No. 12, PageID.313.)

> Q.   Okay.  And you didn't apply for any kind of leave because you weren't sure what kind of leave you were going to have?
>
> A.   Correct; yup.

(ECF No. 12, PageID.315.)

Thus, Horn's own testimony illustrates that he never asked for an FMLA leave nor gave notice of the need for an FMLA leave.  (*Id*., PageID.313-15.)  This dooms his claim because under both FMLA interference and retaliation theories of recovery, the employee must show that the employer had notice of either the employee's "intention to take leave," or the employee's exercise

23

of rights under the FMLA.  *See Tennial v. United Parcel Serv., Inc.* 840 F.3d 292, 308 (6th Cir.

2016); *Edgar v. JAC Prod.*, 443 F.3d 501, 508 (6th Cir. 2006).  At most, Horn provided notice that

he "could be" requesting leave at some unspecified future date, which is insufficient.  *Wallace v.*

*FedEx Corp.*, 764 F.3d 571, 586 (6th Cir. 2014) (holding that "part of reasonable notice generally

includes an indication of 'the anticipated timing and duration of the leave.'") (quoting *Cavin v.*

*Honda Am. Mfg., Inc.*, 346 F.3d 713, 723-24 (6th Cir. 2003)).

For these reasons, Bosch is entitled to summary judgment on Horn's FMLA claim.

> 4.      *Bosch is Entitled to Summary Judgment on Horn's ELCRA claim (Count V)*

Horn claims that Bosch discriminated against him in violation of the ELCRA, M.C.L. §

37.2202.  (ECF No. 1, PageID.21.)  Bosch points out that M.C.L. § 37.2202 prohibits

discrimination based on religion, race, color, national origin, age, sex, height, weight, or marital

status, and Horn fails allege any conduct by Bosch or its employees related to these protected

characteristics.  (ECF No. 11, PageID.185.)  Bosch is correct.

Section 37.2202 of the ELCRA states:

> (1) An employer shall not do any of the following:
>
> (a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate
> against an individual with respect to employment, compensation, or a term,
> condition, or privilege of employment, because of religion, race, color,
> national origin, age, sex, height, weight, or marital status.

M.C.L. § 37.2202.

Since Horn has not alleged discrimination based on any of these protected characteristics,

Bosch is entitled to summary judgment as to his ELCRA claim.

> 5.      *Questions of Fact Exist on the Present Record with Respect to Horn's*
> *Retaliation Claim (Count VII)*

Horn alleges that his "filing of an EEOC claim constitutes activity protected under the

PDCRA, MCL § 37.1201 *et seq*." and that Bosch violated his rights under that statute when it fired him after he filed the claim.  (ECF No. 1, PageID.23.)  Bosch counters that Horn cannot establish a *prima facie* case of retaliation.  (ECF No. 11, PageID.177.)[6]

In order to make out a *prima facie* case of retaliation, Horn must show:  (1) he was engaged in protected activity; (2) the decision-makers knew of the protected activity; (3) the decision-makers took materially adverse action against him; and (4) a causal connection between the protected activity and the adverse action.  *See Bachman v. Swan Harbour Assoc.*, 252 Mich. App. 400, 435 (2002); *Reeder v. Cty of Wayne*, 177 F. Supp. 3d 1059, 1081 (E.D. Mich. 2016).

There is no dispute that Horn engaged in protected activity; on June 12, 2018, he filed an EEOC complaint alleging disability discrimination.  (ECF No. 1, PageID.83; ECF No. 11, PageID.178.)  There is also no dispute that Horn's termination was an adverse action.  (ECF No. 11-12, PageID.276.)  Moreover, Horn claims that Bosch knew of his first EEOC Charge prior to his termination.  (ECF No. 16, PageID.350.)

At least on the present record questions of fact exist as to the timing of Horn's termination. In his affidavit, Johnson averred:

> 12. The decision to terminate Mr. Horn's employment was made on June 8, 2018.
>
> 13. On June 15, 2018, Mr. Horn was offered severance.  Mr. Horn subsequently declined the Company's offer of severance.

(ECF No. 11-1, PageID.189-90.)

In its summary judgment brief, Bosch writes, "On June 15, 2018, Bosch informed Mr. Horn

---

[6] Bosch also claims that even if Horn could establish a *prima facie* case of retaliation, Bosch had a legitimate, non-discriminatory reason for terminating Horn, and Horn has no evidence of pretext. (ECF No. 11, PageID.177.)  The Court already addressed those issues above, finding questions of fact exist on the present record.

that he was being terminated, *effective as of June 8, 2018*." (ECF No. 11, PageID.161) (emphasis added.) Bosch did provide an Administrative Change Form regarding Horn's termination that appears to be "digitally signed" on June 8, 2018. (ECF No. 11-12, PageID.276.) However, that same document indicates that Horn's "Last Day Worked" was *June 15, 2018*, and that his "Termination Date" was *June 16, 2018*. (*Id.*) The timing details are obviously important to Horn's retaliation claim because, as noted above, Horn filed an EEOC charge on June 12, 2018. With nothing in the record to explain the discrepancy about Horn's termination date, and construing the existing evidence in the light most favorable to Horn, summary judgment is not warranted on this claim.[7]

For all of these reasons, Bosch's motion for summary judgment as to Horn's retaliation claim based on the filing of his June 12, 2018 EEOC charge should be denied without prejudice.

## II.    RECOMMENDATION

For the reasons set forth above, this Court **RECOMMENDS** that the Bosch's motion for summary judgment **(ECF No. 11)** be **GRANTED IN PART AND DENIED IN PART WITHOUT PREJUDICE**; Bosch's motion should be **DENIED WITHOUT PREJUDICE** as to Horn's "regarded as" disability discrimination claims (Counts I and VI) and as his retaliation claim (Count VII). As to those claims, Bosch should be permitted to file a renewed motion for summary judgment within 45 days after it produces the documents ordered by the Court in its Order on Horn's motion to compel. (ECF No. 21.) Bosch's motion for summary judgment should otherwise be **GRANTED**.

---

[7] While "temporal proximity, standing alone, is not enough to establish causal connection for a retaliation claim," *Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010), the Court has concluded that Horn is entitled to additional discovery as to Bosch's contentions about the timing of its decision to terminate him and its determination that he was "insubordinate." (ECF No. 21.)

Dated: June 1, 2020                        s/David R. Grand
Ann Arbor, Michigan                        DAVID R. GRAND
                                           United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation, any party may serve and file specific written objections to the proposed findings and recommendations set forth above. *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 1, 2020.

                                           s/Eddrey O. Butts
                                           EDDREY O. BUTTS
                                           Case Manager